IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LUIS RAFAEL BORGES, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| vs. | §CIVIL ACTION NO. 5:24-cv-01233 -HJB | |
| | § | |
| | § | |
| | § | |
| BEXAR COUNTY, TEXAS; and | § | |
| JAVIER SALAZAR, INDIVIDUALLY, | § | |
| Defendants. | § | |

**PLAINTIFF'S OPPOSED MOTION TO COMPEL DEFENDANT JAVIER
SALAZAR TO SUPPLEMENT INTERROGATORY RESPONSES**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW PLAINTIFF LUISE RAFAEL BORGES ("Mr. Borges"), by and

through his undersigned attorneys of record, and, in accordance with Federal Rules of Civil

Procedure Federal Rules of Civil Procedure 33 and 37, files this, his Opposed Motion to

Compel DEFENDANT SHERIFF JAVIER SALAZAR ("Salazar").  For cause of action,

Mr. Borges respectfully shows unto the Court as follows:

**I.
PLAINTIFF COMPLIED WITH
LOCAL RULE CV-7(g)'s CONFERENCE REQUIREMENT**

Pursuant to Rule CV-7(g), Mr. Borges certifies that counsel engaged in a good-faith

effort to resolve this dispute prior to filing the present Motion. As reflected in Exhibit 1,

Correspondence from Mark Anthony Sánchez, Esq., to Jose Herrera, dated May, 29,

2025, and Exhibit 2, Correspondence from Mark Anthony Sánchez, Esq., to Jose Herrera,

dated June 6, 2025, Mr. Borges's counsel provided detailed written correspondence

identifying each deficiency and requesting supplementation. In addition to these written attempts, the undersigned counsel also conferred verbally with counsel for Defendants, who indicated that Salazar would "stand" on his existing answers and would not provide further supplementation. These efforts satisfy the conference requirement under Local Rule CV-7, and the Parties reached an impasse necessitating court intervention.

## II.
## EXHIBITS

Mr. Borges presents the following exhibits for the Court's consideration, which are incorporated by reference as if fully set forth herein:

1. Correspondence from Mark Anthony Sánchez, Esq. to José E. Herrera, Esq., dated May 29, 2025.

2. Correspondence from Mark Anthony Sánchez, Esq. to José E. Herrera, Esq. dated June 6, 2025.

3. Defendant, Javier Salazar's Responses to Plaintiff's Request for Interrogatories, dated April 14, 2025.

4. Defendant, Javier Salazar's Supplemental Responses to Plaintiff's First Set of Interrogatories, dated May 9, 2025.

5. Defendant, Javier Salazar's 2nd Supplemental Responses to Plaintiff's First Set of Interrogatories, dated May 23, 2025.

6. Defendant, Javier Salazar's Responses to Plaintiff's Second Set of Interrogatories, dated May 28, 2025.

7. Policy Manual, General Employment Matters, § 4.03.

8. Home Investigation Summary, June 4, 2024.

9. Oral Deposition Transcript of Raul Garza, taken on July 25, 2025.

### III.
### STATEMENT OF FACTS

Mr. Borges files this Opposed Motion to Compel because Salazar, the sole final decision-maker who rescinded Mr. Borges's offer of employment, has failed to provide complete and non-evasive discovery responses to interrogatories. The answers sought are straightforward and goes directly to Salazar's personal involvement, motives, and policymaking authority — facts that lie at the core of Mr. Borges constitutional and §1983 claims in this case.

The First Amended Complaint (See ECF No. 23) and Salazar's own sworn interrogatory responses annexed thereto reveal the following:

1.  Salazar is the final, unreviewable policymaker for hiring and discharge. Mr. Borges pleads — and Salazar admits — that he alone is the "final authority for all hiring and discharge decisions" at the Bexar County Sheriff's Office under the Texas Constitution. (See ECF No. 23, at p. 9, ¶20).

2.  Mr. Borges applied for the Detention Officer position and satisfied every pre-employment requirement. Mr. Borges applied on May 18, 2024, after seeing a recruiting flyer published by Salazar on Facebook. (See ECF No. 23, at p. 4, ¶12). He completed the reference check, criminal background check, in-home inspection, and polygraph on May 21, 2024. (See ECF No. 23, at p. 5, ¶13). He received a congratulatory text confirming his academy start date and advising him to submit a two-week notice. (See ECF No. 23, at p. 5, ¶14.)

3.  The Sheriff's Office conducted an intrusive, room-by-room home inspection on June 4, 2024. Deputies digitally recorded, photographed, and took notes during a full inspection of Mr. Borges's home. (See ECF No. 23, at p. 6, ¶16). During that inspection, deputies observed Mr. Borges's wife's religious altar dedicated to *La Santa Muerte*. (See ECF No. 23, at p. 7, ¶17).

4.  Mr. Borges's wife is a follower of *La Santa Muerte*, and Mr. Borges is associated with her protected religious practice. The Complaint describes the altar, its religious significance, and Mr. Borges's marital association with his wife's sincerely held beliefs. (See ECF No. 23, at pp. 7–8, ¶¶17–18). Mr. Borges himself is Roman Catholic but respects and supports his

wife's beliefs — an association protected under the First and Fourteenth Amendments.

5. On June 15–16, 2024, Salazar personally rescinded the offer of employment. Mr. Borges was notified he was "disqualified," and the next day received confirmation that Salazar personally revoked the job offer because of his wife's religious practices. (See ECF No. 23, at p. 8, ¶19).

6. Salazar expressly admits he reviewed written summaries about the altar and discussed Mr. Borges's "fitness" with subordinates. In interrogatory responses (Exhibit 3), incorporated by reference into the Complaint, Salazar states he received written memoranda identifying the altar, as well as discussions with deputies about Mr. Borges's "fitness and character." (See ECF No. 23, at pp. 10–11, ¶21) (citing Interrogatory Nos. 5, 6).

7. Salazar confirms he approved and finalized the decision to rescind Mr. Borges's offer. He testified under oath that he "approved the decision to discharge Mr. Borges because he did not meet the qualifications to be hired as a Detention Cadet." (See ECF No. 23, at pp. 10–11, ¶21; p. 11, ¶22) (Interrogatory Nos. 10–11).

8. Salazar admits there was no written policy, employment standard, or objective criterion that disqualified an applicant based on a spouse's religious beliefs. He testified that he relied solely on his personal experience asserting that *La Santa Muerte* "has been, and can be, a symbol associated with Drug Trafficking Organizations." (See ECF No. 23, at pp. 11–12, ¶23) (Interrogatory Nos. 7–8, 11).

9. Mr. Borges alleges—and Salazar's admissions confirm — that the disqualification was based entirely on Mr. Borges's religious association. This constitutes religious discrimination, retaliatory discharge for protected association, and a policymaker decision binding the County under §1983. (See ECF No. 23, at pp. 12–13, ¶¶31–32; p. 14, ¶¶34–35).

10. The Complaint pleads that Salazar's conduct amounted to establishing or ratifying unconstitutional customs, practices, and policies. Salazar's decision, made with unreviewable discretion, constitutes official County policy under Monell. (See ECF No. 23, at pp. 10–12, ¶¶22–25).

11. Mr. Borges further pleads the "stigma-plus" doctrine and the imposition of an "ineligible for rehire" designation. Salazar's actions stigmatized Mr. Borges while depriving him of employment opportunities, triggering procedural due process protections. (See ECF No. 23, at pp. 16–17, ¶¶43–47).

4

These allegations — supported by Salazar's own sworn prior interrogatory responses — establish that he is a critical fact witness, the sole final decisionmaker, and the sole actor who personally rescinded the employment offer based on Mr. Borges's marital religious association. His refusal to provide full and complete discovery prevents Mr. Borges from examining his motives, the communications leading to the decision, the documents he reviewed, the unwritten criteria he applied, and the County policy implications of his final-policymaker actions.

## IV.
## LEGAL STANDARDS UNDER RULES 33 AND 37

Discovery in federal court is intentionally broad. Federal Rule of Civil Procedure 26(b)(1) provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The Fifth Circuit consistently emphasizes that Rule 26 is to be construed liberally, explaining that discovery is afforded liberal treatment and that the scope of discovery is broad. See Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 820 (5th Cir. 2004); see also Crosby v. La. Health Serv. & Indem. Co., 647 F.3d 258, 262 (5th Cir. 2011). This liberal framework applies with equal force to written discovery.

The interrogatories the focus of this motion fall squarely within this broad scope. Under Rule 33(b)(1)–(3), a party must answer each interrogatory served "separately and fully in writing under oath." Rule 33(b)(4) further provides that any ground for objection not timely asserted "is waived unless the court, for good cause, excuses the failure." And Rule 37(a)(4) codifies the principle that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." See FED.R.CIV.P. 37(a)(4). Together, these rules impose an affirmative obligation to provide full, candid,

5

and non-evasive answers to properly framed interrogatories.  Incomplete answers, evasive answers, half-answers, and answers to questions no one asked are legally insufficient—and under Rule 37(a)(4), they are treated as no answer at all.

The Fifth Circuit has disapproved of boilerplate objections and vague, evasive answers.  In <u>McLeod, Alexander, Powel & Apffel, P.C. v. Quarles</u>, the court held that "[m]erely asserting a boilerplate objection that the discovery request is overly broad, burdensome, oppressive and irrelevant" is insufficient and violates Rule 33.  <u>See</u> <u>McLeod, Alexander, Powel & Apffel, P.C. v. Quarles</u>, 894 F.2d 1482, 1485 (5th Cir. 1990).  Federal courts within this circuit echo this principle: "General, unsubstantiated objections … are insufficient," and interrogatories must be answered with "specificity, detail, and candor." <u>See</u> <u>Heller v. City of Dallas</u>, 303 F.R.D. 466, 485 (N.D. Tex. 2014).  This does not auger well for Salazar's sworn answers to interrogatories.

Consistent with these standards, the interrogatories served on Salazar were straightforward, precisely tailored, and proportional to the claims at issue.  They sought basic information uniquely within Salazar's possession — his knowledge, communications, criteria, policies, practices, and reasoning for rescinding the job offer. These are precisely the types of questions Rule 26(b)(1) contemplates, and which courts routinely require a §1983 policymaker to answer.  The interrogatories were neither confusing nor overbroad; they were direct inquiries tied to specific paragraphs of the First Amended Complaint and Salazar's own interrogatory responses.

**V.**
**<u>THE COURT'S ORDER DESIGNATED SALAZAR THE FINAL POLICYMAKER — A STATUS THAT HEIGHTENS HIS DISCOVERY OBLIGATIONS</u>**

In its August 25, 2025 Order, this Court made a binding judicial finding that Salazar is, for § 1983 purposes, the **<u>final policymaker</u>** for the Bexar County Sheriff's Office with respect to hiring and firing decisions. The Court held that Mr. Borges "plausibly alleged that Salazar himself, personally and unilaterally, made the decision to disqualify Plaintiff from employment." (See ECF No. 39 at 7).

The Court further recognized that the Complaint alleges facts showing that "the official … possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim." <u>Id</u>. And the Court concluded that Mr. Borges's allegations "more than plausibly show" that Salazar — the final policymaker — made the decision that caused Mr. Borges's constitutional injury. <u>Id</u>.

The Court also cited the contemporaneous confirmation from BCSO recruiter Deputy Zoie Kelly, noting her statement that Mr. Borges's application "was disapproved … by the Sheriff for the *Santa Muerte*" and that "he has the final decision and it can't be turned." (See ECF No. 39 at 2–3, 7). These acknowledgments tie directly to Salazar's own interrogatory admission that he possesses "[f]inal hiring and discharge decision authority" for BCSO.

These findings are not incidental. Under well-established Fifth Circuit jurisprudence, a final policymaker occupies the apex of a governmental entity's decision-making hierarchy – Bexar County in the case at bar. He is the official whose single, discretionary choice can bind the County itself. <u>See</u> <u>St. Maron Props., L.L.C. v. City of Houston</u>, 78 F.4th 754, 760 (5th Cir. 2023) (even "a single decision may constitute municipal policy" when made by a final policymaker). Because a policymaker's conduct

7

is, by definition, the County's policy, courts should treat discovery directed to such an official with heightened seriousness.

Why? Because a final policymaker is not a "garden-variety witness." He is the individual whose knowledge, communications, motives, and discretionary judgments are central to the constitutional analysis — indeed, they *are* the key elements of the § 1983 claim. Because his actions alone can impose municipal liability, he bears a correspondingly heightened duty to provide full, candid, and non-evasive responses to interrogatories. Salazar is not merely a participant but the final policymaker and exclusive decision-maker whose conduct forms the very core of the constitutional and § 1983 claims and his evasive or incomplete answers are uniquely and unduly prejudicial to Mr. Borges. No subordinate can replicate or replace his knowledge; only he possesses the facts, motives, and reasoning that are indispensable to evaluating the constitutionality of his actions. Salazar alone holds the essential information, and withholding it deprives Mr. Borges of the only source capable of explaining the decision he personally made.

Thus, the Court's determination that Salazar is the final policymaker places him "at the top of the food chain" for purposes of discovery relevance, necessity, and proportionality. His testimony is not cumulative or collateral; it is essential to the resolution of Mr. Borges's claims. Accordingly, full and complete responses from Salazar are not simply appropriate—they are required under Rules 26, 33, and 37.

## VI.
## SALAZAR'S ANSWERS ARE EVASIVE AND CONTRADICTED BY THE RECORD

Despite being the sole and unilateral decision-maker, whose conduct forms the basis of this § 1983 suit - as the Court has already recognized, ECF No. 39 at 2–3, 7 -

Salazar continues to provide evasive, internally inconsistent, and incomplete interrogatory responses. Mr. Borges has twice conferred under Rule 37 and identified the deficiencies in detail. The pattern across both letters is unmistakable: a clear, narrowly framed interrogatory is met with a vague or contradictory answer, followed by a reasonable request for supplementation. Presented below in narrative form, the deficiencies demonstrate why the Court's intervention is necessary.

> A.   Interrogatory No. 1 (Second Set) - June 6 Letter at pp. 1–2

Mr. Borges asked whether it is BCSO's custom or policy to consider religious affiliation in employment decisions and, if not, why Mr. Borges's religious affiliation was discussed at all. Rather than answer the question, Salazar denied that BCSO considers religion, then immediately shifted to a generalized discussion about *La Santa Muerte*'s association with drug trafficking organizations. He still refused to clarify whether Mr. Borges's religious association was ever discussed, investigated, or weighed in the decision-making process, or to identify any policy governing religious neutrality. Mr. Borges requested supplementation to confirm whether his religious affiliation was considered, and if not, to state that unequivocally; if so, Salazar must identify who considered it, how it was weighed, and what policy governed that evaluation.

> B.   Interrogatory No. 2 (Second Set) – June 6 Letter at p. 2

Mr. Borges next asked whether BCSO treats an applicant's association with a follower of *La Santa Muerte* as a factor in employment decisions. Salazar again denied any formal policy but justified how undefined "associations" may be considered where misconduct is suspected. This response avoids acknowledging whether Mr. Borges's own association was evaluated, who evaluated it, or how. Mr. Borges requested

supplementation to state clearly whether Mr. Borges's association with his wife's religious beliefs was considered in rescinding the offer or barring reapplication, and to identify who conducted that assessment and by what standard.

C.    Interrogatory No. 3 (Second Set) – June 6 Letter at p. 2

Mr. Borges asked why he was told he did not "fit the needs" of BCSO and requested identification of the specific factual basis for that conclusion.  Salazar offered only vague references to "form letter language" and undetailed "discrepancies" in Mr. Borges's Walmart history—none of which had appeared in prior responses.  He refused to identify what needs Mr. Borges allegedly failed to meet, what discrepancies were found, or what standard applied to these determinations.  Mr. Borges requested supplementation identifying the specific needs, discrepancies, and policies that formed the basis of the determination.

D.    Interrogatory No. 4 (Second Set) – June 6 Letter at p. 3

Mr. Borges sought the basis and standards for the determination that he was "not eligible to reapply."  Salazar again cited unspecified Walmart issues but still failed to explain the policy, practice, or standard for barring future employment or whether this standard had been applied to other candidates.  Mr. Borges requested supplementation identifying what rule, custom, or practice governs permanent ineligibility and whether Mr. Borges's case was handled differently than similarly situated applicants.

E.    Interrogatory No. 5 (Second Set) – June 6 Letter at p. 3

Mr. Borges asked for Salazar's personal history of EEO, anti-discrimination, and retaliation training since May 2021. Salazar responded only "not applicable," offering no objection, no explanation, and no certification of reasonable inquiry. This is a facially

noncompliant response to a personal interrogatory directed at a § 1983 defendant. Mr. Borges requested supplementation either supplying the training history or certifying, after reasonable inquiry, that such records do not exist.

F.    Interrogatory No. 6 (First Set) – May 29 Letter at pp. 1 – 2)

Mr. Borges requested identification of all oral and written communications concerning Mr. Borges's religious association or how it related to his character, fitness, or suitability. Salazar first denied the existence of any oral communications whatsoever, but then went on to discuss the content of such communications — asserting that none "influenced perceptions" of Mr. Borges's suitability.    These statements cannot be reconciled: either communications occurred, or they did not.    Salazar's answer creates ambiguity where clarity is mandatory. Mr. Borges requested supplementation clarifying whether communications occurred, who participated, when they occurred, and what was said.

G.    Interrogatory No. 7 (First Set) – May 29 Letter a p. 2

Mr. Borges asked about Salazar's *personal* views on *La Santa Muerte* and whether he believes such an association affects suitability.    Salazar refused to give his personal opinion, instead reciting generalized descriptions about DTOs from third-party sources. He still has not stated whether he personally views such an association as disqualifying, nor whether that opinion influenced Mr. Borges's disqualification. Mr. Borges requested supplementation providing his personal views and clarifying whether those views were applied to Mr. Borges.

H.    Interrogatory No. 10 (First Set) – May 29 Letter at p. 3).

Mr. Borges asked for identification of all participants in the decision to rescind the offer and a summary of the deliberations. Salazar again identified only Chief Deputy Garza and offered vague references to multiple unidentified "factors," including new allegations regarding Walmart employment discrepancies that had never appeared before. These shifting justifications are classic post hoc rationalizations and lack factual specificity. Mr. Borges requested supplementation identifying all participants—including Salazar himself—the role each played, the content of their discussions, and the precise factors evaluated.

Taken together, the pattern is clear.    Every interrogatory at issue was straightforward, targeted, and directly relevant to the decision this Court has identified as being made "personally and unilaterally" by Salazar.  (See ECF No. 39 at 7).  Yet each time, Salazar provided answers that were either contradictory, incomplete, or evasive — forcing Mr. Borges to confer twice and request supplementation point-by-point.

This pattern of evasion is particularly prejudicial because no subordinate can supply the information that Salazar alone possesses.  He is the only decision-maker; he is the final policymaker; and he is the sole source of the facts, reasoning, and motives behind the constitutional injury alleged.  (See ECF No. 39 at 2–3, 7).  The deficiencies summarized above therefore warrant the Court's intervention under Rules 26, 33, and 37.

### VII.
### <u>THE RECORD REVEALS ARBITRARY AND UNREGULATED EMPLOYMENT PRACTICES THAT CORROBORATE THE NEED FOR COMPLETE AND TRANSPARENT DISCOVERY RESPONSES</u>

Before turning to the interrogatory-by-interrogatory deficiencies addressed in Section III, the Court should be aware of the broader context in which Salazar's evasive answers arise.    The Bexar County Sheriff's Office ("BCSO") has adopted internal

12

employment policies that, on their face, contain no objective standards governing the very practices Salazar claims to have relied upon in rescinding Mr. Borges's offer of employment. These deficiencies underscore why Salazar's complete and candid responses are essential to resolving Mr. Borgess' § 1983 claims.

    A.    <u>BCSO Policy Delegates Broad Unchecked Discretion Through Undefined Employment Criteria Such as "Questionable Morals"</u>

The BCSO Policy Manual—approved by Salazar—includes a provision under "General Employment Matters" requiring "an investigation into the character and background" of an applicant in order to "ensure that persons with criminal records, questionable morals, or loyalty and unstable personalities are not employed within the BCSO." (Exhibit 7, Policy Manual, General Employment Matters, § 4.03.) The term "questionable morals" is nowhere defined and provides no objective criteria for evaluators to apply. Such subjective terminology invites arbitrary decision-making, selectively enforced standards, and potential discrimination—precisely the type of conduct that is alleged to have occurred here.

Equally significant, nothing in the policy references, authorizes, or even contemplates the use of a "home inspection" as part of an applicant's employment evaluation. The policy does not describe the purpose, scope, parameters, required documentation, or limits of such an inspection. As a result, the home inspection practice appears to be a wholly unwritten, informal procedure — one that operates as a "shadow policy" outside the formal, approved employment rules of the BCSO.

Because this practice is neither defined nor regulated, it grants individual inspectors almost total discretion to decide whether to conduct an inspection, what to examine, and how to interpret what they observe. And because Salazar is the final policymaker, his

13

allowance, authorization, or ratification of such unwritten practices transforms them into County policy for § 1983 purposes.  In this context, Salazar's evasive or incomplete answers to interrogatories concerning what he reviewed, considered, or approved are especially prejudicial and obstructive.

        B.        <u>Deputy Villareal's June 4, 2024 "Home Investigation" Devolved Into an Unconstitutional Religious Inquisition</u>

The absence of any formal standards for home inspections is not theoretical—it produced a profoundly intrusive and constitutionally problematic encounter in this case. On June 4, 2024, Deputy Villarreal entered the Borges residence, photographed the interior, and questioned the family extensively about their religious beliefs. He then prepared a written "Home Investigation Summary," dated the same day, and delivered it to Salazar. (Exhibit 8, Home Investigation Summary, June 4, 2024).  The following is a summary of the exchange between Villarreal (in his own words), Mr. Borges, and Ms. Borges during this encounter:

- As I walked through the large living area and found a small Offrenda (sic) type altar. I asked the applicant about this and he stated that was his wife's belief in Santa Muerte. I asked him does he believe in this he stated NO I am a die hard catholic and pulled out his necklace with his crucifix. He stated that he respects his wife's beliefs. I asked him if he understood the relationship of the Santa Muerte and the Mexican gangs. He stated he has no belief in Santa Muerte and it's his wife's belief.

- As I left, she came out of her home and came to my vehicle. She asked why I took pictures of her altar and felt her privacy was invaded.

- I also reiterated what Santa Muerte means to us as far as Mexican gangs.

(See Exhibit 8, Home Investigation Summary, June 4, 2024).

These inquiries were irrelevant to any legitimate employment purpose and were overtly tied to the family's religious beliefs and practices. They resulted in conclusions and

insinuations rooted not in fact, but in stereotypes. This conduct supports Mr. Borges's assertion that the BCSO engaged in religious discrimination and denied employment based on protected beliefs and associations rather than job-related concerns.

Deputy Villarreal's actions—and the absence of any policy regulating such conduct — make the details of Salazar's decision-making process central to the § 1983 claims. Villarreal's report was delivered directly to Salazar, and Salazar, as the final policymaker, ultimately rescinded the offer. Full and candid responses from Salazar are therefore crucial for Mr. Borges to assess:

- what role Villarreal's religiously tinged observations played;
- what discussions occurred;
- which "discrepancies" were actually considered; and
- how Salazar interpreted and applied this "shadow policy."

In short, the unconstitutional nature of the June 4 inspection and the unwritten policies that permitted it heighten the importance of obtaining complete and non-evasive responses from the very official who made the ultimate decision.

## VIII.
### GARZA'S DEPOSITION CONFIRMS RELIGIOUS INQUIRIES OCCURRED, WERE IMPROPER, INFORMED THE DISQUALIFICATION DECISION, AND WERE AUTHORIZED BY SALAZAR

The impropriety of Defendant Salazar's evasive interrogatory answers becomes even clearer when viewed against the combined record of (1) the BCSO's vague and unregulated hiring policies, (2) Deputy Villarreal's intrusive and discriminatory home inspection, and (3) Chief Deputy Raul Garza's sworn deposition testimony confirming that religious inquiries were made, were impermissible, and yet became part of the information considered by the ultimate decision-maker. Every part of this chain leads back to Salazar—who delegated final authority to Garza and whose judgment Garza carried out.

15

A.    Policy Invited Arbitrary, Subjective, and Discriminatory Conduct

The Bexar County Sheriff's Office Policy Manual — approved by Salazar— requires a "character and background" investigation to ensure that applicants with "criminal records, questionable morals, or loyalty and unstable personalities" are not hired. (Exhibit 7, Policy Manual § 4.03.).  This undefined reference to "questionable morals" provides no objective criteria and creates a fertile environment for arbitrary, subjective, and discriminatory evaluations.  Nothing in the policy authorizes, defines, or constrains the use of a "home inspection" of an applicant's personal residence.  There are no written standards governing its scope, purpose, or limits.  This absence of formal regulation created an unwritten "shadow policy," giving background investigators unfettered discretion to conduct home inspections and draw their own subjective conclusions—precisely the conditions under which discrimination flourishes.

B.    Deputy Villareal's June 4, 2024 "Home Investigation" Devolved
Into an Unconstitutional Religious Inquisition

The dangers of this unregulated process materialized when Deputy Villarreal entered the Borges home, photographed the interior, and conducted an interrogation centered entirely on the family's religious practices.  His written "Home Investigation Summary" (Ex. 2) contained multiple references to the family's *La Santa Muerte* altar, including his own questioning about its meaning, its alleged relationship to Mexican gangs, and the family's faith.  Ms. Borges — correctly perceiving the intrusion — asked why he photographed her altar and stated that her privacy had been invaded.

These inquiries were irrelevant to any legitimate employment factor and were infused with religious bias. And significantly, Garza confirmed that this report was included in the file he reviewed before he disqualified Borges. (Garza Dep. 44:22 – 45:16).

16

C.      Garza's Deposition Confirms That Villarreal's Religious Inquisition
        Was Improper, Unlawful, and Should Never Have Been Considered

Chief Deputy Garza — whom Salazar personally designated to exercise final hiring authority — testified unequivocally that the religious inquiries made during the June 4, 2024 home inspection were improper, impermissible, and unlawful.  When questioned about whether an applicant's religious beliefs may be explored during any stage of the interview, background investigation, or home inspection, Garza admitted that it would be improper to ask applicants questions about religion and improper to disqualify anyone because of their religious beliefs.  (Garza Dep. 48:24– p. 49:24; p. 51:5 – p. 51:23).

Garza reiterated several times that religion has no place in hiring decisions. Addressing the specific reference to the *La Santa Muerte* altar photographed inside the Borges home, he testified that the Sheriff's Department should not have taken photos of the Borges' religious altar and should not have interrogated them about the purpose of the altar.  (Garza Dep. 52:3 – p. 54:9).  Villareal then lectured Mr. Borges that *La Santa Muerte* is related to "Mexican gangs," implying that Mr. Borges was connected to Mexican gangs. (Garza Dep. 54:10 – 25; p. 55 - 56).

This testimony confirms that Villarreal's questions about the family's altar, his repeated references to "Mexican gangs," and his photographing of the religious objects were completely outside the boundaries of lawful inquiry and contrary to BCSO policy. That Garza found such questioning improper is especially significant because he admits— later in his testimony — that the home inspection report containing these impermissible inquiries was included in the applicant file he personally reviewed before disqualifying Borges.  This underscores the constitutional significance of the religious inquisition and

17

further demonstrates why Salazar's evasive interrogatory answers cannot be permitted to stand.

> D.    Garza's Testimony Shows That Every Screening Official Approved Borges, He Passed Every Pre-Employment Requirement, and Only Garza—Acting With Delegated Final Authority—Disqualified Him

Garza's deposition also established that, before the file reached him, Borges had passed every stage of the BCSO's multi-layered hiring process and had been recommended for hire by every official in the chain of review. Garza verified that Deputy Kelly's background investigation was complete and satisfactory (Garza Dep. 24:24 – p. 30:2) Garza further authenticated Exhibit 19 to his deposition, a written memorandum signed by Captain Motayne, which endorsed and approved Mr. Borges's application for final review. (Garza Dep. 30:23– p. 32:15).  Garza explained that, under standard protocol, Sergeant Rivera and Captain Motayne would not have forwarded the file unless each agreed that the applicant had satisfied all requirements. Although Garza could not personally confirm Rivera's signature on the packet, he testified that the process required the sergeant's review before a captain signed the file.

Thus, by the time the file reached Chief Garza, every screening official — Deputy Kelly, Sergeant Rivera (by process), and Captain Motayne — had endorsed Borges for hire. Despite this unanimous support, Garza alone overrode the chain of recommendations, wrote "denied" on Exhibit 19, initialed and dated it June 14, 2024, and thereby disqualified Borges.  (Garza Dep. 32:25– p. 32:22).  No one else in the chain found any basis to reject Borges, and no one other than Garza was involved in the actual decision to deny the application.

18

E.  <u>Garza Acted With Salazar's Express Delegation of Final Hiring
Authority, and the Decision Reflected Salazar's Own Judgment</u>

Garza also testified that the authority he exercised was explicitly delegated to him by Salazar. (Garza Dep. p. 9). The delegation game directly from Salazar. (Garza Dep. p. 9). Garza then explained that this category of decisions ran directly to Salazar without intermediate authority. (Garza Dep. 10 – p.11)

His authority was not theoretical. Garza confirmed that he personally held the power to approve or reject applicants based upon authority delegated to him by Salzar. (Garza Dep. 15). In other words, he exercised operational final authority.

Thus, the sworn testimony of Defendant Salazar's chosen delegate shows that the decision to disqualify Borges was made (1) by a final policymaker's designee, (2) pursuant to authority expressly granted by Salazar, and (3) in a manner that reflected Salazar's own judgment. These facts place the constitutional responsibility squarely on Salazar, and they render any attempt by Salazar to disclaim involvement or knowledge untenable.

F.  <u>This Record Squarely Contradicts Salazar's Interrogatory
Responses and Demonstrates the Need for Full Supplementation</u>

Garza's deposition testimony directly contradicts Defendant Salazar's interrogatory responses in three major respects. First, whereas Salazar denies that any religious information was considered, Garza confirms that Villarreal's religiously probing inquiries did occur, were improper, and were in the file he reviewed. Second, while Salazar attempts to justify *La Santa Muerte* references as related to "law-enforcement concerns," Garza testified that religion should not have factored into the interview or hiring process.

Third, Salazar disclaims responsibility for the final hiring decision, but Garza testified that he acted pursuant to Salazar's delegated authority and that the decision to

rescind the offer reflected Salazar's own judgment.  Taken together, the sworn deposition testimony demolishes the validity of Salazar's written answers, which are now shown to be evasive, inaccurate, and incomplete. Under Rules 33(b) and 37(a)(4), such responses must be treated as failures to answer — and the need for supplementation is particularly acute given this Court's prior finding that Salazar is a final policymaker whose actions bind Bexar County.  (See ECF No. 39 at 7).  A final policymaker cannot shield critical facts behind vague or contradictory responses, especially when his own delegate's testimony exposes those omissions.

## IX.
## RELIEF REQUESTED

Mr. Borges respectfully requests that the Court issue an Order compelling Salazar to serve full, complete, and non-evasive supplemental responses—verified under oath and consistent with the sworn testimony of his own Chief Deputy—to the following interrogatories, each of which is specifically identified in Section III of this Motion as deficient:

1. **Interrogatory No. 1 (Second Set):** Whether Plaintiff's or his spouse's religious affiliation, practices, or symbols were considered in the hiring decision.
2. **Interrogatory No. 2 (Second Set):** Whether an applicant's association with a follower of *La Santa Muerte* is treated as disqualifying or relevant to suitability for employment at BCSO.
3. **Interrogatory No. 3 (Second Set):** The factual basis underlying the assertion that Plaintiff did not "fit the needs" of BCSO.
4. **Interrogatory No. 4 (Second Set):** The standards, customs, or practices governing determinations that an applicant is "not eligible to reapply."
5. **Interrogatory No. 5 (Second Set):** Salazar's training history concerning anti-discrimination, EEO, and retaliation, or certification after reasonable inquiry that such records do not exist.
6. **Interrogatory No. 6 (Second Set):** Identification of all oral and written communications concerning Plaintiff's religious association and his "character" or "fitness."

7.  **Interrogatory No. 7 (First Set):** Sheriff Salazar's personal views on *La Santa Muerte* and whether such views influenced Plaintiff's disqualification.

8.  **Interrogatory No. 10 (First Set):** Identification of all participants, discussions, and considerations leading to the rescission of Plaintiff's job offer.

9.  **Interrogatory No. 11 (First Set):** The full factual basis for Salazar's decision to rescind Plaintiff's offer of employment.

Each of these interrogatories is specifically analyzed in the body of the Motion, supported by pinpoint references to Salazar's deficient responses and to the deposition testimony of Chief Deputy Garza. No interrogatory is listed here that was not challenged above, and no challenged interrogatory has been omitted.

A.      <u>Request for Expenses and Attorney's Fees Under Rule 37(a)(5)</u>

Because Defendant Salazar's evasive and incomplete interrogatory responses constitute a "failure to answer" under Rule 37(a)(4), Mr. Borges further requests an award of reasonable expenses, including attorney's fees, pursuant to Rule 37(a)(5)(A).  Under Rule 37(a)(5)(A), when a motion to compel is granted, "the court must… require the party… whose conduct necessitated the motion… to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless one of the narrow exceptions applies.  None do here.  Defendant's responses were not substantially justified, and Mr. Borges made multiple good-faith attempts to secure supplementation before seeking relief.

Fifth Circuit authority confirms that fee-shifting under Rule 37(a)(5) is mandatory when a party forces its opponent to move to compel by offering evasive or incomplete discovery:

- <u>Merritt v. Int'l Bhd. of Boilermakers</u>, 649 F.2d 1013, 1019 (5th Cir. Unit A 1981) (Rule 37's fee-shifting provisions are "mandatory and not permissive" absent substantial justification).

- <u>Batson v. Neal Spelce Co.</u>, 765 F.2d 511, 514–15 (5th Cir. 1985) (affirming fee award where the resisting party provided inadequate discovery, explaining Rule 37 is "designed to protect diligent parties from undue delay and obstruction").
- <u>McLeod, Alexander, Powel & Apffel, P.C. v. Quarles</u>, 894 F.2d 1482, 1484–85 (5th Cir. 1990) (evasive, boilerplate, or incomplete answers violate the Rules and justify sanctions).

The pattern in this case — vague assertions, contradictory explanations, refusal to answer straightforward questions, and shifting post-hoc rationalizations — fits squarely within the type of conduct Rule 37 was designed to deter.

Moreover, the prejudice is heightened because Salazar is the final policymaker whose unilateral decision is the act of the County. (See ECF No. 39 at 7). Because he possesses the necessary information, Salazar's evasive responses obstruct the truth-seeking process in a uniquely harmful way. Accordingly, Mr. Borges respectfully requests an award of the reasonable expenses and attorney's fees incurred in preparing and filing this Motion, as required by Rule 37(a)(5)(A), along with any additional relief the Court deems just and proper.

## X.
## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF LUIS RAFAEL BORGES respectfully pray that the Court take judicial notice of his Motion to Compel and grant him further relief, either at law or in equity, to which he may be justly entitled.

Respectfully submitted,

SÁNCHEZ & WILSON, P.L.L.C.
www.SanchezWilson.com
MARK ANTHONY SÁNCHEZ, ESQ.
6243 IH-10 West, Suite 1025
San Antonio, Texas 78201
 (210) 222-8899
 (210) 222-9526 (TELECOPIER)
E-MAIL ADDRESS:  mas@sanchezwilson.com
WEB SITE:  www.sanchezwilson.com
ATTORNEYS FOR PLAINTIFF

By: /s/ Mark Anthony Sánchez
        MARK ANTHONY SÁNCHEZ, ESQ.
        TEXAS STATE BAR NO. 00795857


## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(g), I certify that I conferred with counsel for Defendant Salazar via correspondence dated May 29 and June 6, 2025, requesting supplementation and clarification of the interrogatory responses at issue. Defendant declined to supplement.  These efforts have conclusively ended in an impasse, leaving open the necessity for court intervention.

/s/ Mark Anthony Sánchez
MARK ANTHONY SANCHEZ, ESQ.


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing Plaintiff's Opposed Motion to Compel has been delivered *via* E-File Notification on this the 21st day of November, 2025, to José E. Herrera, Esq., Assistant District Attorney - Civil Division, 101 W. Nueva Street, 7th Floor, San Antonio, Texas 78205.

/s/ Mark Anthony Sánchez
MARK ANTHONY SANCHEZ, ESQ.

23

NOTICE OF ELECTRONIC FILING

      The undersigned counsel hereby certifies that he has electronically submitted for filing a true and correct copy of the above and foregoing in accordance with the Electronic Case Files System of the Western District of Texas on the 21st day of November 2025.

/s/ Mark Anthony Sánchez
MARK ANTHONY SANCHEZ, ESQ.

G:\My Files\1-Sanchez\Borges, Luis\Pleadings\Motion - Compel_Salazar.docx

24